Case number 15-7063 et al. BCB Holdings Limited et al. v. Government of Belize appellate. Mr. Besson-Hoyle for the appellate. Mr. Kimmelman for the appellate. Good morning. This is another case that represents the problem that Belize is facing. We have companies that don't want to pay their taxes. And they're coming to the United States by slapping our arbitration clause on secret agreements with the government and then hoping that the courts here ignore all that and just confirm it under the New York Convention. In this case, you have the CCJ, the Caribbean Court of Justice. The CCJ was established after the year 2000 by 15 nations of the Caribbean to act as their Supreme Court. Before that, appeals from the Supreme Court of Belize or the Court of Appeals were taken to the Privy Council in the UK. The problem with that was that the Privy Council was always biased in favor of the British, which were the former colonists of all of these different countries in the Caribbean. So this country said, enough of that. We're going to have our own Supreme Court that's going to make decisions for us. Now, here the CCJ has looked at the agreement. Let's just talk a second about the agreement. What's the agreement in this case? The former prime minister of Belize signs a confidential agreement with these companies who are controlled. Am I right that Belize didn't make any of those arguments, didn't make this argument at the arbitration agreement, didn't show up at the arbitration agreement, right? Belize did. At the arbitration. Correct. They did not go. Why? Because the agreement was unauthorized. If we're going to get into off-the-record stuff, tell me that. I'm sorry? If we're going to get into things that aren't on the record, why don't you tell me, why didn't they contest that argument there? Isn't that the place to make the argument? No, it's not the place because the New York Convention provides a public policy defense, so it can be making connection with the New York Convention. Also, that was an unauthorized agreement. And wasn't there a later action in the United Kingdom to enforce the award, and wouldn't that have been a place to make the argument as well, but didn't make it there? You had two chances to make this argument. Now you're making it here on the third time. Belize could not have gone and participated in the arbitration because this was an illegal agreement signed by the prime minister of Belize. You go to the arbitration and say this is an illegal agreement. Well, no, because then you have given effect to the arbitration clause and you have recognized that sort of tactics. Here you have the prime minister of Belize that signs an agreement with a secrecy clause that he's going to guarantee a company owned by his biggest campaign contributor, Lord Ashcroft, the deputy chairman of the Conservative Party in the UK. According to the New York Convention, we're quite limited, aren't we, in terms of the defenses we can consider. There are seven defenses, right? And the only one that you cited, I think, is the public policy defense. Correct, correct. And I think we fit squarely within the public policy defense. And why is that? Let me explain why. There are countervailing public policies of the United States that would be violating by giving effect to this award and giving effect to this agreement. One is the significant public policy against government corruption overseas. I guess I'm worried about containing that principle because a lot of contractual agreements are going to be alleged to be corrupt. And how are we supposed to know in deciding whether to enforce an arbitration award? How are we supposed to get into that? Well, the CCJ has held that it is corrupt, that it violates core constitutional separation of powers principles, that the prime minister didn't have that authority, that it violates core principles of democracy throughout the Caribbean. The language of the CCJ decision is extremely strong. So this is not just every case. You have a regional court saying this is a corrupt agreement. We have the Supreme Court of the United States in Pimentel acknowledging the existence of a significant, quote-unquote, policy of combating international corruption. And so this would be a case where you would hold that the countervailing policy outweighs the policy in favor of arbitration. Otherwise, Judge Griffith, what you have is you open the door for corrupt politicians to slap an arbitration clause in the Caribbean, and you're sending it back to England, back to the LCIA, where the stack is going to be against the Belizean interests. Other principles that are countervailing policies are, again, separate. Why do you say it would be against the Belizean interest to be before an arbitrator in London? Because it's being administered by the London Court of International Arbitration, that the forum is in London, that arbitration will be subject to British law, et cetera. Let's think about it if that's something that would have happened in the United States. Let's say the head of the EPA or the IRS entered into some sort of agreement. Would the United States want that to be adjudicated in London or in the United States? We certainly would want to judge the actions of our own government officials in the United States, and that's why there is a public policy defense in the New York Convention. Let me turn to statute of limitations. That judges the district court's decision is internally inconsistent because she says on the one hand only the defenses on Article 5 are available. Corruption point, one more thing. Are there any other cases that have recognized that as a basis for setting aside an arbitration? No, there's always a case of First Depression. This is a case of First Depression. Although I will say that the State Department, if you look at their website and we cite it in our papers, they recognize that there was corruption in the administration of Prime Minister Moussa. So turning to statute of limitations, here the basis of the statute of limitations stolen finding is the law, the criminal law related to injunctions overseas. That cannot possibly be the basis because there was no injunction entered against these defendants. So that decision was in error. Second, there was no chilling effect because as you know, Judge, they went to the U.K. and they enforced the award in the U.K. They weren't chilled in the U.K. They could enforce the award in the U.S. And finally, tolling doesn't apply if you follow the reasoning of the district court because there's not a word about tolling in the convention. So we've got to make a decision. Are we stuck with the language of the convention or not? If we're limited to the language of the convention, the convention says you've got to file your action in three years, says nothing about tolling. So we cannot import into that convention tolling. We also cannot import into that convention tolling because Section 207, the three years, is a jurisdictional statute. Why? Remember, Belize has sovereign immunity under the FSIA. How about equitable estoppel?  Whether it had an actual chilling effect or not would certainly— the purpose of it was to slow things down, to get them not to bring suit, and now you're relying on the fact that they did precisely what that statute intended to say the statute of limitations was against them. That's not an equitable tolling argument. It's an equitable estoppel argument. Isn't Belize estopped? No, we have the same law in the U.S. If this court enters an injection against my client and we violate it, you can hold it civilly liable. You can also hold it in criminal contempt. Belize just followed the same— What was the point of that statute? It was to get them not to bring suit, right? And they didn't, but now you're claiming the benefit of that. No, it was not directed at them. It was a general statute that said that if you violate a court injunction in Belize, you can be subjected to civil or criminal damages. But there was no court injunction against them, and so it didn't apply. And that last issue I want to point out is Res Judicata. Here we have the same parties— I'm sorry, you said maybe there was an injunction directed at them, but they were subject to the statute, right? If we had sought an injunction against them, we didn't. And it didn't stop them. They didn't respect that statute in the U.K. If it didn't stop them in the U.K., it didn't stop them in the U.S. With respect to Res Judicata, you have the same parties, the same agreement, the same award, the same course of action before the CCJ, New York Convention, and you have the same public policy. And that's the last point I want to make. They argue that the CCJ was the public policy of Belize. Here we're talking about the public policy of the U.S. That's incorrect. If you read that decision, the CCJ said that separation of powers, that a prime minister cannot overwrite a legislative enactment of parliament. That's a core constitutional principle of all democracies around the world. So we're talking about the same parallel constitutional principles that we also hold here in this country. We normally don't call those corruption, though, right? I'm sorry? When there's a separation of powers issue, we normally don't use the phrase corruption involved, right? We have these disputes over the extent of the president's power and the extent of Congress's power. We had a big one yesterday in front of the Supreme Court. I don't remember anyone using the phrase corruption. Yeah, but President Obama's not giving tax breaks to companies owned by his biggest contributors. That's the difference. All right. Thank you. Counsel for Apolli? Good morning, Your Honors. Louis Kimmel representing the Apollis here, BCP Holdings, and the Belize Bank. If I may, I'd like to address the two issues, as I understand them, that have been presented. The tolling issue, I'd like to do that first, if I may, and then go to the public policy issue thereafter, if that's convenient. You agree you went to England, right? I'm sorry? You agree you went to England, right, after this statute was in effect? Yes, Your Honor, and I can explain exactly why. No. The point is you went. Yes, and, well, we did go, and, in fact, we needed to go in order to protect ourselves. I understand you want to take whatever legal action you can, but why the statute of limitations? What about that? The proceeding in England is a proceeding based on the New York Convention that is without notice to the other party. On the day we filed our papers, the court issued an order and a judgment. Now, under U.K. law, that order and judgment are not enforceable for six months so that service can then be made on the opposing party, and it has the opportunity to come in and challenge the order and the judgment. So we took a step, as this court recognized in the commission's case, there are alternative ways to, in fact, enforce an award, through the New York Convention or, in fact, through securing a judgment. And in order to protect ourselves, because our award had not been enforced in Belize at that time by the Court of Appeal and because the time was running to get a judgment in the U.K., we took that step. And the reason that we were not chilled in doing that is because in one day, without notice to the government, we could obtain the order and judgment that we were entitled to under the New York Convention, and they never went into the U.K. court to challenge the award or the order or judgment. Was the chill different in doing that than in doing this? Your Honor, the difference is this, and we had experience at that point in time. Remember, we went into London in February of 2013. As Your Honor will recall, we were before this court in the fall of 2011, as I recall, because BSDL, which the government has alleged from the beginning is related to Lord Ashcroft, was the assignee of an LCIA award that it received in 2009. We commenced proceedings in the district court to enforce that award under the New York Convention. And as the court may recall, six months into that case, the government enacted the criminal statute. It was our position from the day we filed that proceeding that the Belize court did not have jurisdiction over BSDL because service had not been made on our client. However, once the criminal statute was enacted at the end of March 2010, we were in the position where the government had filed a motion to dismiss and in opposition to our confirmation papers, exactly the same papers that were filed in this case were filed in the BSDL case. And we needed to respond to their papers. To respond to their papers, we needed the cooperation and the input from Belize Council. We sought that input from Council, and in our papers we submitted to this court, Belize Council has testified, and it's uncontroverted, that he refused to provide support for us and would not provide an affidavit that we needed because he was in jeopardy of violating the Belize criminal statute if he provided us with papers that we would then file. But how does that affect? Are you still trying to figure out how that affects why you couldn't file in this case? Well, the reason we couldn't file in this case was after Belize Council was unable to assist us, we made a motion in the district court, Your Honor may recall, we made a motion to suspend the scheduling order and for a status conference because my firm at the time concluded that because of the breadth of the criminal statute, the fact that it applied to those who, quote, aid and abet, and it included providing counsel and assistance, directly or indirectly, and that it had what we call group liability, that if a group were found liable, every partner would be found liable as well unless the partner could prove that he or she was not aware of what had gone on. If I was going to England, how does that avoid potential liability? Well, the reason was that the proceeding in this court is a proceeding on notice that is in the nature of a motion practice. We knew from the BSDL case that we would... So you went to England and gave no notice to the government of Belize, right? As the UK statute provides. I understand. But I'm just saying you didn't think the statute prevented you from doing that. That's aiding, isn't it, arguably? Well, the government had not sought an injunction against us. Precisely. Correct. But we knew from the proceeding here, which is a different kind of proceeding. It's a proceeding, A, on notice that requires filing of papers. You agree, do you not, that the Belize statute reached action, potentially, reached action taken in London? It could, yes, Your Honor. But you nevertheless went ahead and did it. Yes, Your Honor. And, in fact, we tried... You thought you could sneak it by them so they wouldn't know? Is that the idea? No, no, because we served them with the papers. No, you just told us you went to England without notice to them, got this the same day that you filed, and the only thing that kept you from moving further was under English law you had to wait six months. Well, we received the full enforcement. We served the papers, and there's no dispute about that, on the government. The government never appeared to contest the enforcement of the award because it has no defenses. That's after you got the order from England. Correct. All right, let's be clear about that. It was no notice to the government of Belize when you went to England. Because the procedure in the U.K. is without notice. That's how they do it in the U.K. I understand that, counsel, and you took advantage of that. I understand, but the Belizean statute potentially applied to your going to England, didn't it? If the government sought an injunction, yes, it would, but they didn't. Why does that matter? The point is that you felt that statute could have applied, as you said to Judge Rogers, you nonetheless went. Correct. The statute could have applied here, and you say it chilled you from going. Correct. So what's the issue? The difference is this, because we had a case that actually was before this court that showed us exactly what the government would do if we filed another proceeding in the U.S. And the timing of that was after you had gone to England? No, the timing of the case in this court was before we had gone to the U.K. Right. So that warning about what could happen you had at the time you went to the U.K., and yet you still went. Am I missing something there? In other words, it didn't chill you from going to the U.K. That's the bottom line. Well, it didn't. No, it didn't, because the procedure was different than the procedure here. We knew under the procedure here exactly what the government would do because we had multiple cases in which they did the very same thing. So what do you think they would have done? It would have done? They would have sought an ex parte injunction, as they did in every other case, and they always received it. And our Belize Council would again be unwilling to provide a witness statement on Belize law, which we needed. In my firm. You're assuming that the district courts here all act the same. All right. An injunction was issued by one district court doesn't necessarily mean another district court is going to issue an injunction. Well, every judge in Belize that was asked by the government to provide an ex parte injunction granted it. No, I just asked you, Counsel. Yes. If you had come here, what would have happened? And you said, well, the government of Belize would have sought an injunction. From the Belize courts, as they had in every other case. From the Belize courts. Yes, from the Belize courts. That's right. And then what would have happened? Then our Belize Council would again, as they had in BSDL, and it's in the record, would have refused to assist us. What did they have to do when you say assist you? What does assist you mean? The government's papers in the record in the court below, as in BSDL, had witness statements from government experts on Belize law, and they testified about the Belize law that they claimed was relevant to the underlying contract. So you wanted discovery? No, Your Honor. We wanted to be able to respond to what they said. I don't understand that you're suggesting the government counsel had a duty to assist you? No, Your Honor. I'm sorry. What I'm saying is that the government's papers in opposition to our enforcement proceeding in every single case we filed in this court. In which court? In the district court. In the United States District Court. Correct. That has included witness statements from lawyers in Belize as to Belize law and as to arguments they've made as to why Belize law forecloses the enforcement of the LCIO award at issue in each case. So you already had that from these other cases? Their witness statements, yes, and I needed to be able to respond on behalf of my clients. So you knew what the government was going to say because you had discovered, quote-unquote, these statements about its interpretation of Belizean law, right? Well, they filed different statements in each case, and I needed to be able to respond to them on behalf of my client. And that's what we tried to do in BSDL. It's in the record here. It's actually on A78, paragraph 4546. Belize counsel refused because he was chilled by the criminal statute. He had sought the advice of independent counsel, and he could not cooperate. So if you filed here, you couldn't proceed in effect because Belize counsel couldn't help you? Correct, and in addition to that, as in BSDL. So you decided not to file at all? Yes, and in addition, my firm was unable to proceed because we concluded that if we filed opposition papers to the papers that the government filed, we might well be in violation of the criminal statute. But you already said you risked that going to London. Well, we knew there was a risk in London, yes, but there was no injunction, and nothing happened. Is the argument that you got away with it in going to London, but later calculations were maybe you weren't going to get away with it because you had to give them notice and they were aware of what you were doing? I don't think so, Your Honor. Your Honor, I think the point really is that the chill, the effect of the campaign that the government undertook felt different. It was different later than it was in London. Well, it's different. It was different in the U.S. than it was in the U.K., and there could be reasons for that. It could be, and I believe this is true, that there are assets in the United States that the government wanted to protect, and therefore to defend aggressively here was far more important than to defend at all in London. Well, counsel offered another theory as to why they set up the CCJ. So they didn't want people running off to London. Well, but there was one thing counsel left out, and that is there are 15 members of the CCJ, but only four countries have signed up to the compulsory appellate jurisdiction of that court. Maybe so, but 15 agreed to the organization establishment of the CCJ. Correction. And counsel's reasons as to why they did that. I'm just trying to understand why you could take this calculated risk as to going to London, but you were unwilling to take it in this country because you thought that counsel for Belize would not be able to cooperate, and so your case could not go forward. That's your explanation, but we don't know that, do we? Well, Your Honor, but we do know it from the BSDL case and from this court's mandamus decision. We know that we had to file. My firm wasn't able to file papers in opposition to their motion to stay. So even though there was no injunction, I just need to understand what your firm's position is. As to all your other clients, all you can do is go off and get a midnight order in London? No, Your Honor. We didn't. I didn't. Our firm didn't do the enforcement in the U.K. because we're not U.K. counsel, obviously. But what happened in BSDL in the district court in this district. Your client. Yes, our client sought that, yes. That's okay. Yes, but we knew from an experience of an enforcement proceeding in this very district exactly what the government was going to do. And in that case, we as counsel and our expert in Belize as counsel could not assist our client. Interestingly, counsel, I'm not suggesting that what you are saying here is not correct, but none of this is in the district court opinion. The district court just says tolling applies. It doesn't tell us why. With all due respect, Your Honor, we made two arguments in the district court, both tolling, equitable tolling, and equitable stop. And the record, which is before this court and which the district court refers to, goes through the entire campaign that the government of Belize waged against Lord Ashcroft and every single company he was affiliated with. Right. No, the district court recites that history. But all of this that you're telling us now, I didn't see that anywhere in the district court opinion. I mean, she says there was this statute that was passed. Right, and the underlying testimony in the record from the counsel who could not assist when the criminal statute was in force explains the exact campaign that took place in Belize and how it impacted company after company and individuals, all of whom were in some way related to Lord Ashcroft. And that campaign, we believe, represents actions taken by the government, which either constitute an estoppel because they're seeking to take advantage of those actions in this court and say that the statute of limitations should, in fact, apply to us when they took steps which were calculated to ensure that we did not file. The whole purpose of the campaign and the purpose of the criminal statute was to prevent companies like our clients and others from filing claims outside of Belize in neutral fora, either under arbitration clauses or under treaties providing for arbitration, or, as in this case, to take an international arbitration award covered by the New York Convention and enforce it in any jurisdiction in the world that the New York Convention provides for enforcement. And the purpose of the criminal statute was to deter parties from doing exactly that. So, but your client was not deterred. I want to be clear, I'm not talking about the law firms here. We're talking about the parties. Our client was deterred from going into the United States, but was not deterred from seeking relief in a high court in London, correct? And obviously that troubles, at least me, the distinction between the two. Well, I understand that, Your Honor. And so then your fallback position is equitable estoppel, right? Yes, Your Honor, but even beyond that, there's an explanation for why the calculation was right. Remember, this agreement has an international arbitration clause. But let me say, counsel, using the word right in this context is a little bit, what, questionable? I mean, your client was dealing with this allegedly corrupt prime minister that the State Department has acknowledged the government was corrupt. He's benefiting from, arguably, an unlawful act by a prime minister who gave him all these tax breaks. So the notion that somebody is right in this case is just troubling. Well, Your Honor, with all due respect, I know my colleague has raised the public policy of corruption. But what I can tell you is, and I've looked through the record very carefully, there's no evidence in this record of corruption. There's no evidence. Did the prime minister have authority to give your client a tax abatement? Your Honor, all I can tell you that a tribunal of three arbitrators in London... In London? I'm talking about in Belize. That's the whole point here, counsel. No, Your Honor, that's not the point. I know that's what the government wants the point to be. No, no, it is the point, all right? You have this court that says your client owes these taxes, and we're not getting into that. The only question I had was, was it error to apply equitable tolling, since your client was not deterred from going to England, all right? It was not error. And just to be clear, the arbitration we're talking about, that the parties agreed to in a contract, and the award is in the record. The award considers whether the agreement is legal, whether the prime minister had authority. It considers every conceivable issue that you can imagine, and it concludes that the agreement was legal. It was issued the same day you filed your papers. That's what you told me. No, no, no, no. I'm sorry, Your Honor. I'm talking about the arbitration award. The arbitration award was rendered and issued in August of 2009. Who rendered that? Three arbitrators in London. That's my point, all right. No, but, Your Honor, that's what's in the party's contract under the New York Convention. That's what they agreed to. And if the government ever had a problem with the arbitration clause, they could have challenged it. But they never did. Not in the arbitration, because, as you know, they never showed up. Not in the district court, where we sought to enforce the award. They didn't challenge the arbitration clause. So they had to figure out a way to appear but not appear before the arbitration panel. They could have appeared subject to a claim of lack of jurisdiction, but they didn't. They just ignored it. You can show up and claim that it's not arbitrable. Absolutely, Your Honor, and it's done all the time. Yes. And, in fact, tribunals... Most of the experiences, at least, that I've had with arbitrations, whether it is arbitrable in the first instance. And, as the court knows, that issue can be raised either with a court or it can be raised with a tribunal or it can be raised both, depending on the sequence. So, Your Honor, all these issues about these claims about the contract's illegal, there was no authority, all of that was vetted by the tribunal. That's the place where it was supposed to be decided, and it was decided. Okay. So you say there's no merit to the statute of limitations argument because you were entitled to equitable tolling. Yes, Your Honor. Because of this campaign. Yes, Your Honor. This campaign, which was based upon the government getting ex-party TROs at the drop of a hat and always getting them from a Belizean judge and never not getting it, coupled with a statute. And, Your Honor, you know what the statute says. So your client goes to London or has attorneys in London file and get this midnight judgment. And now where are we? Well, where we are is there is a judgment in the U.K., as the New York Convention provides for, because you can enforce awards in any jurisdiction. And London is a particularly appropriate one to enforce because it was the seat of the arbitration. It's the court of primary jurisdiction. And, Judge Griffith, what I was trying to tell you before is I think Belize would never go into London or into England because throughout all of these cases it's tried to ignore the fact that the only jurisdiction with primary jurisdiction over the arbitration awards are the courts in the U.K. And it does not want to be in those courts because then it will have to acknowledge that those are the courts, the only courts in the world, that can set aside an award if there are any bases to do so. In contrast, so we have a judgment from the U.K. enforcing this award. We wanted to get a judgment from the United States enforcing the award, as the New York Convention provides for. But in light of the BSDL case, we were chilled because we knew what would happen from the BSDL case if we filed. So tolling was correct, was properly applied, is your position? Yes, Your Honor. And secondly, essentially, there is no public policy to overcome what the government of Belize is claiming is an agreement that is corrupt at its core. That's what counsel says, but that's not what the CCJ court said in its opinion, nor is it what counsel said in the district court. The argument in the district court was that enforcing, and the issue under the New York Convention for this court is, is enforcing the foreign arbitration award rendered in London a violation of U.S. public policy under Article 5 2B of the New York Convention? Now, as this court knows, the cases in this circuit and every circuit say that exception is very, very narrow. It deals only with the most fundamental policies of our society. It is often invoked. It is rarely ever used. I don't know of a single case. Let me ask you. Give me an example. Well, I have one, but there's no case. Genocide. I'm sorry? Genocide. Well, actually, what I was thinking of, Your Honor, is I thought in the United States that if there were an arbitration award where it could be said that the First Amendment was violated, or another constitutional amendment, maybe with respect to religion, something that goes to the essential values of our society. And I know of no such case. And I know of no award that's been set aside in the U.S., not enforced in the U.S., on public policy grounds. But it has to be of that magnitude. Right. None whatsoever, to your knowledge. To my knowledge, none whatsoever. And I've seen it raised in every case. And in the second BSDL case, which this Court just decided and which Rehearing and Bank was denied on, the same argument was made under public policy and rejected by this Court properly. So not only are the defenses and the Article III provisions to be narrowly construed, the scope of our review is very narrow as well. It absolutely is, Your Honor. And I believe that had this report not concluded that equitable tolling was improper, we argued both equitable estoppel and tolling. And I think this may be one of those unusual cases where the extraordinary circumstances are all the making of the other side. And in such a situation, whether one calls it tolling or whether one calls it estoppel, the fundamental point is the same. They achieved through their criminal statute and their policies what they wanted. We were unable to, we felt unable to file. And we did everything humanly possible. We challenged the criminal statute. We appealed every decision against us. We ultimately convinced, we together with others, ultimately convinced the Caribbean Court of Justice that the key provisions of the criminal statute are unconstitutional. The mandatory fine and imprisonment term. The reversal of the presumption of innocence. And it's after we achieved that, and we had to litigate three separate cases all the way to the CCJ to try to undo the government's policies. And when we were able to finally get the last step accomplished, which was the criminal statute, we then filed in the district court, as we had in BSDL. But now I was able to get police counsel to file a witness statement, which is in the record here. And my firm was able to litigate the case because we were not in fear of a criminal statute. And so we believe that the district court was right. Whether it's equitable tolling or equitable estoppel, this filing is timely. Well, counsel, I appreciate your bearing with me here. Were there any other points you wanted to make? No, Your Honor. The court's indulged me a great deal in terms of time. So I'm quite grateful. I think we've covered everything else in our papers. All right. Thank you. Counsel for appellant? My esteemed colleague is raising a lot of smoke. This case has nothing to do with BSDL. He cannot invoke an injunction entered against a different company as a basis in this case. Here there was no injunction against BCB Holdings or Belize Bank. Here they decided those companies to go to the U.K. and file. I don't care if it took them one second to file that paper. If you're going to violate the law, you can violate it by filing. If there had been an injunction, how would it have worked? Let's say the Belizean government, let's say they did file in the district court here, and the Belizean government wanted to enjoin that. What would have happened? What would the process be in Belize? The Belizean government would need to bring an action against them in Belize, and they would have an opportunity to respond. Okay. But here's the point. They were not chilled because they filed. They would have been guilty. I'm sorry? They would have lost. They would have lost. But let me make these two points to respond to your question. Number one, there was no injunction. They had not violated any law. The government cannot prosecute you because they didn't file here. No, but the government cannot prosecute you because they think you're going to kill someone. There was no injunction. There was nothing pending, nothing to chill them, and evidence of that. There was a law. Correct me if I'm wrong. Right. There was a law that if they filed, they reasonably thought so they say, then there would be action brought against them in Belize. That law permits a court in Belize to issue an injunction. If you then violate that injunction, then you violate the law. So here's the sequence. They file in the district court here. Right. Then what happens? And then Belize decides they want to invoke that statute. What happens then? Then they would have to go get an injunction, and that would freeze. The Belizean government would go to the court in Belize. In Belize, get an injunction. And then after that, they couldn't do anything. Then they cannot do anything. But what has happened? They have stopped the running of the statute in the U.S. because they filed. They didn't do that, so they didn't stop the running of the statute. There was nothing to prevent them to come here like they went to the U.K. and stopped the running of the statute. If I can go back, I wasn't quite finished yet. So the government of Belize gets the injunction because they have filed here. Correct. And then are they then criminally liable for what they've done? No. Because to file here, they spoke to counsel in Belize. He filed an affidavit. They filed here. Then the injunction comes. Is that lawyer in Belize who helped them criminally liable for what he has done? Absolutely no, because the criminal laws are not retroactive. But the injunction would cover. They can file here because there was no existing injunction. So you're saying it just stops. They just can't do anything more after that. But there's no criminal liability for what they've already done. Absolutely not. And they have stopped the running of the statute in the United States, which is what they could have done. And that's what they did in Belize. Exactly. They went there, and they were not shielded from doing so. Let me just make two quick points.  You being Belize to go after someone who filed an action in contravention of that statute. The statute says you can't violate an injunction of the Supreme Court of Belize. That's a crime. So, obviously, you've got to have an injunction. You can't violate something that doesn't exist. If there's no injunction against this company, you can't violate the law. Had the Supreme Court of Belize ordered? What had the Supreme Court of Belize done? Nothing with respect to that statute, with respect to these companies. With respect to other companies, what had the Supreme Court of Belize done? With respect to one company, not others, BSDL, the government of Belize obtained an injunction against BSDL. They filed a case here. We obtained an injunction, and then this case was stopped. And then the Court of Appeals reversed the state. No one was prosecuted. Nothing happened. Remember, in BSDL, in this case, after they filed in the U.K., the government of Belize takes no action. We don't prosecute them. We don't try to get an injunction. We do nothing. But even if we had done that, it would have stopped the statute of limitations here, and then this case would be stayed. Now, the only other point that I want to make is about arbitrability. This is not an issue of arbitrability, whether the subject matter of the claim is subject to arbitration. That dispute was that the prime minister didn't have authority to sign the arbitration clause in the first place. So you have to decide who do you defer to. Do you defer to the arbitrators, or do you defer to the CCJ? The CCJ is more neutral, and the New York Convention allows you to defer to the CCJ under the public policy defense. Thank you. Thank you. We'll take the case under advisement.
judges: Rogers, Griffith, Kavanaugh